Jules LINK and Solomon Katz, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

MERCEDES–BENZ OF NORTH AMERICA, INC., Defendant.

Civ. A. No. 74–0771.

United States District Court,
E.D. Pennsylvania.

Aug. 12, 1985.

Richard F. Stevens, Allentown, Pa., for plaintiffs.

Robert J. Spiegel, Philadelphia, Pa., for defendant.

## OPINION

CAHN, District Judge.

Before me are post-trial motions in this antitrust class action. The defendant is Mercedes-Benz of North America, Inc. ("MBNA"), a wholly-owned subsidiary of Daimler-Benz, Aktiengesellschaft.[1] Plaintiffs are a certified class of consumer purchasers of nonwarranty repairs of Mercedes-Benz automobiles from 1970 to the present.[2] For the reasons set forth below,

---

1. Although the parent was originally named as a defendant, it was agreed at trial that plaintiffs would proceed solely against MBNA.

2. For details regarding certification of the class, see *Link v. Mercedes-Benz of North America, Inc., Daimler-Benz A.G.,* 1975–2 Trade Cas. (CCH) ¶ 60,534 (E.D.Pa.1975), *appeal dismissed,* 550 F.2d 860 (3d Cir.1977).

the motions will be granted in part and denied in part.

## I. *Background*

Plaintiffs allege that MBNA and its dealers conspired to fix and raise the price of nonwarranty repairs of Mercedes-Benz automobiles.[3] They contend that the conspiracy was effected through the dealers' use of the MBNA Labor Time Guide to calculate repair charges to consumers. As explained in my memorandum opinion of August 17, 1984, the time guides list many typical repairs and assign a certain number of operation hours to each. Dealers who use the time guides do not charge consumers for the actual time spent repairing their automobiles but charge whatever "operation" period of time is specified in the guide for the particular operation. In addition, each dealer sets an hourly rate to be charged for mechanics' services. The hourly rate is multiplied by the time unit specified in the time guide to reach a total price for each repair. Plaintiffs contend that MBNA and its dealers agreed to use the time guides as a mechanism for fixing and raising the price of nonwarranty repairs, in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1983).

After a lengthy trial, the jury returned a verdict for defendant, finding that MBNA had not conspired with its dealers to fix and raise the labor charges for nonwarranty repair work.[4] Plaintiffs have filed a motion for a new trial or judgment n.o.v., a motion to alter, amend, and vacate the judgment, and a motion to set trial and hearing dates for injunctive relief relating to labor and parts.[5]

## II. *Motion for a New Trial or Judgment N.O.V.*

Plaintiffs advance six major arguments in support of their motion for a new trial. First, they argue that a new trial is warranted because there was an unauthorized contact with a member of the jury during trial. Second, plaintiffs contend that the court improperly submitted an issue to the jury and improperly excluded another. Third, they assert that, after informing counsel of the instructions it intended to give to the jury, the court impermissibly deviated from that charge. Fourth, plaintiffs argue that the court gave the jury erroneous instructions on price-fixing and concerted action. Fifth, they maintain that the court erred in the admission and exclusion of certain documentary evidence. Sixth, they contend that the jury verdict was against the weight of the evidence. In addition to these primary claims, plaintiffs raise numerous other arguments in support of their motion for a new trial. They also maintain that they are entitled to judgment n.o.v. because defendant failed to adduce sufficient facts to justify the verdict.

## A. *Juror Contact Issue*

The jury returned with its verdict on October 5, 1984. On October 9, 1984, plain-

---

**3.** In a prior order filed April 30, 1984, and opinion and order filed May 29, 1984, I granted summary judgment for defendant on plaintiffs' claim of overcharges in the sale of parts, based on *Illinois Brick Co. v. State of Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). I also noted that plaintiffs who purchased parts from franchisee dealers could continue to seek injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26 (1983). *See Mid-West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573, 590–94 (3d Cir.1979). Plaintiffs' claims in this regard are discussed later in this opinion.

**4.** The jury answered "no" to the following interrogatory:
　　1. (a) Have the plaintiffs proved by a preponderance of the evidence that Mercedes-Benz of North America, Inc., acted (not individually

but in a concerted way) with one or more of its dealers by contracting, combining or conspiring with a conscious commitment to a common scheme to fix and raise the labor charges for non-warranty repair work?

**5.** Plaintiffs have also moved to set a hearing date on their motions for sanctions. This request is denied and the motions dismissed. The trial was structured to provide both sides with ample opportunity for discovery. I believe that defendant made every reasonable effort to produce documents in its possession and otherwise cooperate in discovery matters. Because I find no conduct by defendant that warrants the imposition of sanctions, there is no basis for further consideration of these motions.

tiffs advised the court that one of the jurors, Mr. James Brooks, may have been contacted by a defense lawyer during the course of the trial. Mr. Brooks reportedly mentioned the phone call to another juror, Mr. Edward Fura. Based on this information, and in consultation with attorneys for both plaintiffs and defendant, the court decided that both jurors should be called for questioning.

Mr. Fura was contacted immediately by telephone, put under oath, and questioned on the record as to his knowledge of the incident. According to Mr. Fura, Mr. Brooks told him that, during the course of the trial, Mr. Brooks had received a telephone call from a member of the defense team at the hotel room where he was staying. The caller reportedly said, "I don't want you, I want one of my lawyers." Transcript of October 9, 1984, Hearing ("Fura Transcript") at 33. Mr. Fura stated that this was the full extent of his conversation with Mr. Brooks on the subject. Fura Transcript at 33–34.

Mr. Brooks appeared in person for questioning before the court on October 10, 1984. Again, counsel for plaintiffs and defendant were present. In response to the court's inquiry, the following colloquy took place:

Q: Mr. Brooks, you were a juror in the case of *Link, et al. v. Mercedes-Benz, et al.*, and, as I just told you, the lawyers think that there is a possibility that some person who may have said he was a lawyer telephoned you during the trial, at some point during the trial.

Is there something to that?

A: Your Honor, I did receive a phone call by someone anonymous. Now, I don't know whether it was a lawyer or someone that had the wrong number, but I identified myself by saying that, "I'm James Brooks," and at that time I was in—I don't remember the room, but I told him my room number, and they hung up.

Q: There was nothing else said?

A: Nothing else, Your Honor.

Q: Did the voice sound familiar to you?

A: It did. It sounded like Mr. Spiegel, it sounded like him, but I couldn't be certain.

Transcript of October 10, 1984, Interrogation of Juror James Brooks ("Brooks Transcript") at 3–4. At this point, Mr. Brooks was asked to wait in a side office and the court asked the lawyers if there were any questions they wished the court to ask. In response to the lawyers' suggestions, Mr. Brooks was called back for more questioning. At that time, he answered as follows:

Q: Mr. Brooks, could you be a little more specific about what was said in the phone call by the caller and by you?

First, tell me, to the best of your recollection, everything the caller said to you.

A: Well, the caller asked for a name, I cannot remember the name, and I responded by saying: "No, I'm James Brooks, and this is room ...," whatever, I can't remember the room, I don't know if it was 212 or 310 or whatever, and that was it.

Q: Nothing else was said?

A: Nothing else was said.

They asked for a name, and I responded by giving them my name.

Q: What made you think that this caller was an attorney in the case?

A: Well, like I said, the voice sounded like Mr. Spiegel. That's the only, that's the only identification I could—I could recognize the voice, you know.

Q: Nothing was said about the case?

A: Oh, no; no, Your Honor.

Q: What did you say to the caller?

A: I said: "No. This is James Brooks," room number whatever, and they hung up.

Brooks Transcript at 14–15. Mr. Brooks went on to say that the topic of the phone call had come up because the jurors were discussing where the lawyers stayed during trial. Mr. Brooks recalled saying to the other jurors that he had seen a few of the lawyers at the Hilton Hotel and thought one of the lawyers had called his room there. Brooks Transcript at 17.

■ Plaintiffs claim that a new trial is warranted based on this evidence of an unauthorized juror contact. I disagree. The seminal case in this area is *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), in which the Supreme Court stated that:

> [p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least until their harmlessness is made to appear.

*Id.* at 150, 13 S.Ct. at 53. As subsequent cases establish, once an improper communication has been made to a juror, a presumption of prejudice arises that is rebuttable only by a strong contrary showing. *See, e.g., Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). While *Mattox* was a criminal case, this rule has also been applied to civil actions. *See, e.g., Hobson v. Wilson*, 737 F.2d 1 (D.C.Cir.1984), *cert. denied, —— U.S. ——*, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Rinker v. County of Napa*, 724 F.2d 1352 (9th Cir.1983); *Krause v. Rhodes*, 570 F.2d 563 (6th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 517 (1978).

■ In this case, even assuming, *arguendo*, that there was a juror contact of the type that would trigger the *Mattox* presumption, the harmlessness of the contact has clearly been shown. In making this determination, I have carefully reviewed the testimony of jurors Brooks and Fura. Nowhere in the record does either juror suggest that the caller engaged Mr. Brooks in conversation beyond that reported above. According to Mr. Brooks, whose

testimony I found fully credible, the caller hung up without saying anything after Mr. Brooks identified himself. Thus, not only did the caller communicate nothing about the pending action, but there was no conversation at all. Mr. Brooks stated that he thought the voice on the phone was similar to that of a defense lawyer, but that the caller did not identify himself or mention this case.

In view of the evidence developed through the questioning of jurors Brooks and Fura, I find that the contact was most likely an accidental wrong number that could have had no influence on the case. I note that the jurors were questioned about the phone call as soon as possible after the court was advised of a potential problem. The questioning took place on the record with all counsel present. The lawyers were invited to apprise the court of questions they wished to have asked. These measures adequately developed the factual basis of the situation so that the harmlessness of the contact became apparent. Under these circumstances, there is no basis for a new trial due to an improper juror contact.[6]

## B. *Submission of Issues to the Jury*

Plaintiffs argue that a new trial is warranted because material issues in the case were improperly submitted to or withheld from the jury. First, they assert that the court erred in submitting to the jury the issue of whether the Mercedes-Benz time guide used to calculate the price of nonwarranty repairs was inflated. Second, they argue that the court improperly withdrew

---

6. Plaintiffs asked that a full evidentiary hearing be held on the juror contact issue. I denied this request by an order dated November 15, 1984. I feel that such a hearing is neither compelled by the case law in this area nor warranted by the circumstances of this case. In my view, the actions taken to investigate the alleged juror contact were adequate to protect the rights of the parties and insure the fairness of the trial. Plaintiffs contend that under *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), the court was required to hold a full evidentiary hearing at which counsel would have the opportunity to cross-examine witness-

es. While this may be the appropriate course to take in criminal cases involving clearly improper juror contacts or serious questions of juror bias, I do not feel that a hearing of this type is mandated in a civil action where no improper contact has been shown. *See, e.g., Standard Alliance Industries v. Black Clawson Co.*, 587 F.2d 813, 828 (6th Cir.1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979) ("The correct response of a trial judge, when confronted with allegations of improper jury contact, is to give notice to the parties and to question the jurors on the record about any alleged incident.").

from the jury the issue of whether or not Mercedes-Benz dealers were using "Service Management Controls," a management system that requires use of the MBNA time guide in calculating repair charges to consumers. Because I find there was no error in either respect, I reject plaintiffs' request for a new trial on these bases.

My instruction to the jury to determine whether the Mercedes-Benz time guide was inflated was proper in view of the theory advanced by plaintiffs throughout trial and the evidence introduced in support of that theory. The heart of plaintiffs' case was that MBNA purposefully inflated the operation hours contained in its time guide so that, by using the guide, its dealers could raise the prices of nonwarranty repairs above competitive levels. Plaintiffs first sounded this theme early in the trial when they made repeated references to an inflated time guide in their opening statement. Plaintiffs gave specific examples of customers' being charged for more hours of labor than were actually required to do a repair. Transcript of Trial ("Tr.") Vol. I at 28–29, 39–40. Plaintiffs' counsel referred to these extra hours—the difference between the time established by the time guide for a certain repair and the time it actually took to do the repair—as "phantom time." See e.g., Tr. Vol. I at 48–49. The manner in which MBNA constructed the allegedly inflated guide and inserted the so-called "phantom time" was discussed at length. Tr. Vol. I at 48–59.

Plaintiffs presented evidence, both in their direct case and on rebuttal, that supported their theory that MBNA constructed an inflated time guide to raise prices. The deposition testimony of Mr. Wolf-Dietrich

Willam, for example, was introduced largely for this purpose. Tr. Vol. II (P.M.) at 103–107; Vol. III (A.M.) at 3–59. In addition, much of the testimony of Dr. Susan Wachter, an economist, was proferred on rebuttal to demonstrate that plaintiffs had an economic motive to construct an inflated time guide. Dr. Wachter described in detail how a scheme to raise prices would operate in a franchisor-franchisee situation. Tr. Vols. XX (A.M., P.M.), XXI (A.M.).

In view of the theory of liability pursued by plaintiffs throughout trial, the court instructed the jury that it should first determine whether the MBNA time guide was inflated, since this was crucial to plaintiffs' case. The court told the jury that, if they found the time guide was not inflated, plaintiffs' theory failed and the jury should return a verdict for defendant. Tr. Vol. XXV (P.M.) at 181–84.

Plaintiffs claim that the court erred in several respects in submitting the inflation issue to the jury. They contend that the court added the inflation issue to the case only after plaintiffs rested their case in chief and that the inflation issue was not one of the issues set for trial in the court's order of April 30, 1984.[7] They also argue that the court confused the jury because the term "inflation" was not clearly defined.

■ I reject plaintiffs' arguments for the following reasons. First, the issue of whether the time guide was inflated was not injected by the court after plaintiffs rested their case. On the contrary, plaintiffs proceeded on this theory from the beginning of the trial, as demonstrated by

7. Of particular relevance is paragraph 7 of the order which states:

The issues in the "conspiracy" phase of the trial will be the following:

(a) Are Mercedes-Benz dealers bound by contract to use Mercedes-Benz Service Management Controls, and if so, which dealers are so bound. Does a requirement that Service Management Controls are to be used necessarily mean that Mercedes-Benz Labor Time Guide values will be followed.

(b) Did Mercedes-Benz combine with some or all of its dealers to set the labor times in

the various Mercedes-Benz Labor Time Guides to be used for nonwarranty repairs by the combining dealers, and/or, did Mercedes-Benz combine with some or all of its dealers to promulgate and use Mercedes-Benz Labor Time Guides and thereby fix prices dealer-wide for nonwarranty repairs.

(c) Did Mercedes-Benz combine with some or all of its dealers to fix or peg the customer labor rate charged by those dealers on non-warranty repairs.

the passages from their opening statement cited above. Second, the order of April 30, 1984, was intended to focus the parties' attention on issues that were open for consideration in the conspiracy phase of the trial. The theories that plaintiffs would actually pursue, the evidence to be presented in support of those theories, and the defenses that would be raised could not be determined in advance. Thus, the issues set for trial by the order were subject to modification by the manner in which the parties chose to present their cases. Finally, I disagree that the use of the term "inflated" was confusing to the jury. Both parties consistently used the term throughout trial without any suggestion that it needed further definition, and I believe that its intended meaning was sufficiently clear.

■ Plaintiffs also argue that it was incorrect to withhold from the jury the issue of whether MBNA dealers were using "service management controls," another issue set forth in the April 30, 1984, order. In particular, plaintiffs object to the following instructions given to the jury before a recess:

Again, members of the jury, let me focus your attention [on] what you're to decide in this case. You're not to decide whether or not the dealers were using these controls or so-called controls. What you're to decide is whether Mercedes-Benz entered into a conspiracy with one or more dealers which had the purpose— which had a conscious purpose to raise and fix prices for non-warranty repair work.

Tr. Vol. V (A.M.) at 117. This instruction was an appropriate attempt to focus the jury's attention on the central issue in a complex case. As noted earlier, the pretrial order was intended to guide the parties by setting out issues that could be considered in the conspiracy phase of the trial. The basic issue, however, always remained the same: whether MBNA conspired with its dealers to fix the price of nonwarranty repairs. While the use of service management controls was relevant to this issue, and evidence was therefore permitted on that point, it was important that the jury not concentrate on this one area of evidence to the exclusion of the ultimate issue in the case. The instructions to the jury were appropriate under these circumstances.

C. *Alleged Errors Relating to the Jury Charge*

1. *Changing the Charge Without Advising Counsel*

■ Plaintiffs assert that, after informing counsel of the instructions it intended to give the jury, the court deviated from the planned charge to plaintiffs' prejudice. After carefully reviewing the record on this issue, I conclude that my instructions to the jury were consistent with those discussed at the charge conference and that, in any event, plaintiffs suffered no prejudice from the charge as given.

Plaintiffs are primarily concerned with alleged changes in the court's instructions on the types of actions MBNA was permitted to take to encourage its dealers to use the MBNA time guide for nonwarranty repairs. In discussing this issue with counsel at the charge conference, I first informed them of the general approach I would take in charging the jury:

I'm going to tell the jury that we are on a line. At this end we have printing a price on in a newspaper or a sticker on a car window. At this end we have a formal written agreement to use an inflated labor time guide with intention to join in a common scheme to fix and raise prices. This case is somewhere in between. The jury has to draw the line. [At] a point on that line, independent activity ceases to be independent and it becomes concerted. The jury must determine whether in this case that line has been crossed by Mercedes-Benz of North America.

Tr. Vol. XXII (A.M.) at 109. Further discussion revolved around specific words that would be used in the charge. Defendant requested an instruction that it was permissible for MBNA to persuade and cajole a franchisee to use the time guides. Tr. Vol.

XXII (P.M.) at 186–87. The court indicated that it was hesitant to tell the jury that to persuade and cajole were acceptable because these words suggested action that was closer on the line toward illegally seeking an agreement. Tr. Vol. XXII (P.M.) at 191. The court continued to make clear that, in its view, "[w]hat Justice Powell teaches us [in *Monsanto v. Spray-Rite Service Corporation,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)] is that the nuances of those words are not important, what's important is was there concerted action or not." Tr. Vol. XXII (P.M.) at 198. Reiterating its intention with respect to the charge, the court stated that the thrust would be to "give [the jury] guidelines as to what's independent activity in pricing nonwarranty repair work and what's concerted activity and where they should draw the line." Tr. Vol. XXII (P.M.) at 210.

The court adhered to this position in charging the jury. It first instructed them that "[t]he line between independent action, which is legal, and concerted action, which is illegal, in regard to pricing matters is one of the issues you must decide based upon the evidence presented to you." Tr. Vol. XXV (P.M.) at 174. The court repeatedly stressed that the central issue was whether MBNA and its dealers "had a conscious commitment to a common scheme to fix and raise prices above the level they would have been in the absence of agreement." Tr. Vol. XXV (P.M.) at 175. In attempting to guide the jury in distinguishing between concerted and independent activity, the court stated that:

> Mercedes-Benz of North America may suggest and recommend, and if the dealer follows independently, there's no problem. It's also true that if Mercedes-Benz persuades, cajoles and teaches or advocates a certain policy, the dealers may independently adopt that policy. But when you start to use words like teach, advocate, persuade and cajole, it seems to me you come a little closer on the line to joint or concerted activity and away on the line from independent activity.

Tr. Vol. XXV (P.M.) at 177. The court summed up by instructing the jury that their job was to determine where on that line to "draw the perpendicular" separating illegal concerted action from legal independent action. Once the jury had made "the perpendicular cut," they were then to decide on which side of this line the conduct of defendant fell. Tr. Vol. XXV (P.M.) at 186.

Plaintiffs argue that they were prejudiced by these instructions because, in reliance on the court's position at the charge conference, they had argued to the jury that to persuade or cajole was illegal; while the court subsequently instructed the jury that such actions were permissible. Plaintiffs' argument fails in several respects. Contrary to plaintiffs' assertions, the court did not suggest to the jury that to persuade or cajole was *necessarily* legal. Rather, the instruction was that these actions could be legal if dealers then acted independently in deciding to use the MBNA time guide. In fact, the court stated that these tactics actually fell closer on the hypothetical line toward illegal concerted activity and away from legal independent action. Thus, the instructions given were consistent with the court's position at the charge conference: it was not the particular words used to describe MBNA's actions but the reality of the situation that was important in determining whether an illegal conspiracy existed or whether the dealers acted independently.

Finally, even if the court had changed its position, plaintiffs have not shown that they were prejudiced by the charge as it was given. Plaintiffs cite several passages of their closing argument which they say were undercut by the instructions that followed. A review of these passages, however, shows that they are generally consistent with the charge. Counsel for plaintiffs argued, for example, that MBNA effectuated its scheme by "teaching and cajoling and persuading and everything else that goes into concerted action rather than just a simple recommendation." Tr. Vol. XXIV (A.M.) at 100. Plaintiffs contended that "this whole scheme is a little more than just a recommendation. When you send

people out to sell it ... that's not a simple recommendation to take it or leave it, that's actual concerted action." Tr. Vol. XXIV (P.M.) at 132. In both plaintiffs' argument and the court's instructions to the jury, the emphasis was properly placed on concerted action as the key to finding a violation of the antitrust law.

### 2. *Allegations of Substantive Errors in the Charge*

■ Plaintiffs also allege that the jury charge was legally erroneous in many respects. *See* Plaintiffs' Reply Brief in Support of Motion for Judgment N.O.V. or for a New Trial at 71–78.

One of their primary arguments is that the court erred in its charge on price-fixing by instructing the jury to determine whether MBNA was engaged in a scheme to "fix and raise" prices. Plaintiffs contend that the correct standard is that any scheme to fix, peg, raise, maintain, or stabilize prices is illegal. While the formulation urged by plaintiffs is correct as an abstract statement of antitrust law, it is not appropriate in this case. In their opening argument, plaintiffs summarized their case as follows:

> Now, briefly, what we're going to show is that Mercedes-Benz, beginning in 1965, began a course of conduct which had the effect of artificially ... raising and inflating the prices that the customers of the dealers would have to pay for the repairs of their motor vehicles in order to keep them running. Now, [those] 300,-000 plaintiffs that we talked about at the jury selection, those people had their prices fixed and inflated artificially by the acts of the defendant Mercedes, with its agreement with its dealers.

Tr. Vol. I at 25. By instructing the jury to determine whether plaintiffs had conspired to fix and raise prices, I tailored general principles of antitrust law to the evidence and theories plaintiffs presented in this case. Under these circumstances, my charge was legally sound and helpful to the jury's attempts to resolve the complex issues before them. *See Williams v. Inde-*

*pendent News Company,* 485 F.2d 1099, 1107–8 (3d Cir.1973).

■ Plaintiffs also object on substantive grounds to the court's charge that it may be lawful for MBNA to persuade or cajole its dealers to use the MBNA time guide as long as the dealers then independently decide to use the guide. Plaintiffs argue that, under *United States v. Colgate,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), a manufacturer can only announce its suggested pricing policy and refuse to deal with those who fail to comply. According to plaintiffs, any other affirmative action by a manufacturer results in a violation of the antitrust laws.

This argument is based on an overly narrow reading of the case law. As discussed earlier, to make out an antitrust violation, plaintiffs must prove that defendant and its dealers engaged in concerted action—i.e., that they "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Company v. Spray-Rite Service Corporation,* 465 U.S. 752, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 [3d Cir.1980], *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 [1981]). To show a common scheme there must be evidence that defendant sought an agreement from its dealers and that the dealers communicated such acquiescence or agreement. *Monsanto,* 104 S.Ct. at 1471 n. 9. The use of exposition, persuasion, or argument does not necessarily establish that such a common scheme exists. As many courts have recognized, a manufacturer may engage in exposition, persuasion, or argument without affecting its dealers' ability to make independent pricing decisions. *See, e.g., Hanson v. Shell Oil Company,* 541 F.2d 1352, 1357 n. 4 (9th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *Gray v. Shell Oil Company,* 469 F.2d 742, 748 (9th Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973); *Edward J. Sweeney & Sons, Inc.,* 478 F.Supp. 243, 260 n. 36 (E.D.Pa.1979), *aff'd,* 637 F.2d 105 (3d Cir.1980), *cert. de-*

*nied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). *See also Jack Walters & Sons Corp. v. Morton Building, Inc.,* 737 F.2d 698, 708 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 432, 83 L.Ed.2d 359 (1985); *Newberry v. Washington Post Co.,* 438 F.Supp. 470 (D.C.D.C. 1977). This type of activity by a manufacturer may be acceptable if calculated to bring about voluntary compliance with suggested pricing practices. *See* 16A J. von Kalinowski, *Antitrust Law and Regulations* § 6B.02[3] at 6B–41 to –42 (1985). My charge to the jury was consistent with this precedent and accurately reflects antitrust standards in the vertical price-fixing area.

I have also reviewed plaintiffs' other objections relating to the jury charge and conclude that they are without merit.[8]

### D. *Admissibility of Documents*

I turn first to plaintiffs' argument that the court erred in admitting into evidence five labor time guides prepared by manufacturers and publishers other than MBNA. These are the Cadillac Labor Time Guide (Exhibit D–211), the Chilton Import Labor Time Guide (Exhibit D–148), the Motor Age Time Guide (Exhibit D–203), and two editions of the Mitchell Chassis Flat Rate and Parts Manual (Exhibits D–205, D–207). Plaintiffs contend that the time guides were not properly authenticated and are inadmissible hearsay and irrelevant. I disagree.

■ There is no real controversy as to the authenticity of these documents. Plaintiffs do not dispute that the time guides were actually prepared by the manufacturers and automobile publishing companies indicated on their covers. Instead, they argue that there was no evidence on how or whether the guides had been used or distributed. These arguments, in my view, go to the weight to be accorded the documents rather than to their authenticity or admissibility. If it was uncontroverted that the time guides were prepared by the manufacturer or publisher indicated on their covers, their authenticity was sufficiently established for purposes of admission and the question became one of probative force. *See* 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 901(a)[01] at 901–16 to –17 (1983). Plaintiffs were free to argue to the jury that the documents were entitled to little or no weight because no evidence had been introduced as to the extent of their use or distribution. The jury would then have been free to disregard entirely or discount substantially the persuasive impact of the evidence admitted. *Id.*

Even assuming, *arguendo,* that the time guides were not properly authenticated, their admission was harmless error. As discussed more fully below, the guides were admitted to show the existence in the industry of non-MBNA time guides. Because evidence of the existence of such guides was independently introduced through the testimony of witnesses, the effect of admitting the non-MBNA guides themselves was largely cumulative. Accordingly, plaintiffs suffered no prejudice by their admission. *See United States v. Goichman,* 547 F.2d 778, 784 (3d Cir.1976); *Gerhart v. Henry Disston and Sons, Inc.,* 290 F.2d 778, 786 (3d Cir.1961).

■ I also reject plaintiffs' claim that the time guides were irrelevant. As I noted several times, the purpose for introducing non-MBNA time guides was to rebut plaintiffs' contention that the dealers had conspired or engaged in concerted action

---

**8.** Specifically, plaintiffs also contend that the court erred in its charge by (1) setting out an unwarranted distinction between horizontal and vertical price-fixing; (2) instructing the jury that they could not infer an agreement from the advocacy by MBNA of certain business practices and the subsequent statement by a dealer that it intended to follow such advice, where the dealer's decision was independent; (3) referring to

defendant's argument that plaintiffs put on no witnesses who could show that the time guides were inflated; (4) stating that MBNA could recommend the use of an inflated guide if its dealers then agreed to use it independently; (5) telling the jury that it must determine whether each dealer had individually conspired with Mercedes.

when they adopted the MBNA guides. Tr. Vol. XIII (A.M.) at 92; Vol. XVI (P.M.) at 227–32. By introducing the time guides from other manufacturers, as well as testimony from witnesses, defendant was attempting to show that the use of such guides was widely accepted in the industry, making it more likely that dealers acted independently in adopting the MBNA guides and less likely that their decision to use it was the result of a conspiracy. As I stated in charging the jury:

> The fact that other dealers and manufacturers other than Mercedes were using other labor time guides to charge non-warranty repair customers is not a defense in this case if you find that there was concerted activity. But it might be relevant, along with all the other evidence in the case on the issue of whether or not a particular dealer acted independently or acted with Mercedes-Benz in a concerted manner to use an inflated labor time guide.

Tr. Vol. XXV (P.M.) at 174–75. I am still of the view that the time guides are relevant on this point and were, therefore, admissible.

■■■ Plaintiffs also contend that the time guides were inadmissible hearsay. I disagree. As noted above, the time guides were admitted to illustrate industry practice. Soon after the Cadillac guide was admitted, plaintiffs pointed out that, while the court had focused on the authenticity question in admitting the Cadillac time guide, there was also a hearsay problem. Defendant contended that there was no hearsay problem because the time guides were admitted as business records under Fed.R.Evid. 803(6). The court did not accept defendant's argument and agreed with plaintiffs that it might be appropriate to give the jury cautionary instructions that the time guides were presented for a limited purpose only. Tr. Vol. XIII (A.M.) at 106. The court suggested that the appropriate time to deal with this issue would be "when we're talking about cautionary instructions," Tr. Vol. XIII (A.M.) at 107, referring to the charge conference. Despite the court's suggestion, plaintiffs did not propose cautionary instructions in their proposed points for charge, at the charge conference, or during the sidebar conference following the charge to the jury. Plaintiffs did object to the admission of the time guides on the basis of relevancy and offered proposed instructions on this point, which the court accepted. Tr. Vol. XXIII (P.M.) at 122–23. *See also* Tr. Vol. XXIII (P.M.) at 179. Under Rule 51 of the Federal Rules of Civil Procedure, no party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict. Exceptions to this rule may be made in cases of plain error. In this case, plaintiffs did not object to the lack of cautionary instructions on the hearsay issue before the jury retired, and failure to give such an instruction does not amount to "plain error" that would warrant a new trial. *Compare, e.g., Beardshall v. Minuteman Press International, Inc.,* 664 F.2d 23 (3d Cir. 1981) (fundamental error in jury charge constitutes plain error).

■■■ I note that plaintiffs have attempted to buttress their argument by introducing an affidavit based on post-verdict interviews with some of the jurors. According to the affidavit, certain jurors said they had considered the "operation hours" contained in the non-MBNA time guides during the deliberative process. Plaintiffs contend that these statements show that the admission of time guides without limiting instructions was prejudicial and warrants a new trial. It is well settled, however, that "[n]either a trial court nor an appellate court has the authority to inquire into the jury's decisional processes, even when information pertaining to the deliberations is volunteered by one of the jurors." *Domeracki v. Humble Oil & Refining Co.,* 443 F.2d 1245, 1247 (3d Cir.1971), *cert. denied,* 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971). The reason for this rule is to protect participants in the jury system from harassment by the defeated party and to preserve frankness and freedom of discussion in jury deliberations. *Id.* at 1248. Here, consideration of the information ob-

tained from post-verdict juror interviews would result in just the sort of invasion of the deliberative process proscribed by the case law. Accordingly, the information gained from these conversations may not be used as a basis for determining that a new trial is warranted.

■ I turn next to plaintiffs' argument that, in addition to improperly admitting the five labor time guides discussed above, the court also erred in admitting approximately sixty other documents published, for the most part, by other car manufacturers or automobile publishing companies. See Plaintiffs' Reply Brief in Support of Motion for Judgment N.O.V. or for a New Trial at 40–53. Plaintiffs claim that these other documents have not been properly authenticated, were inadmissible hearsay, and are irrelevant.

I conclude that the admission of these documents was proper. First, as with the five time guides, there was no real dispute as to authenticity. In addition, with respect to many of the documents at issue, plaintiffs objected to their admission only on the basis of relevancy, thereby waiving objections as to their authenticity. Second, I find that the documents were relevant to show industry practice and negate inferences of conspiracy. See, e.g., Tr. Vol. XXIII (P.M.) at 130, 154. Additional reasons for the relevancy of particular items were given at the document conference at which they were admitted. Third, the documents were not inadmissible hearsay because they were either admitted under an exception to the hearsay rule or were admitted for a nonhearsay purpose. See, e.g., Tr. Vol. XXIII (P.M.) at 136–37 (Datsun Service Log and Organizer Workbook introduced only to show Datsun had "some kind of a similar system"). Finally, even if the documents were improperly admitted, plaintiffs have not shown that they have suffered any prejudice thereby and their admission is, at most, harmless error.

■ Plaintiffs also contend that two documents, Exhibits P–50 and S–5, were improperly excluded from evidence. Exhibit P–50 is an analysis from defendant's files comparing the cost of servicing two models of Mercedes-Benz automobiles at various mileage intervals with the cost of servicing Cadillac automobiles at the same intervals. The total cost is broken down into service hours, parts costs, and oil and lubrication costs. Plaintiffs point out that the service hours listed for Mercedes-Benz automobiles are higher than those listed for Cadillac vehicles. They argue that the jury should have been permitted to consider this information as evidence that the MBNA time guide is inflated. As I noted at trial, however, Exhibit P–50 was not admissible for this purpose because plaintiffs offered no evidence that the service times listed were for comparable operations. Without such evidence, there was no way for the jury to determine whether the Mercedes-Benz hours were higher because the MBNA time guide is inflated or simply because different or more complicated services were performed. I also reject plaintiffs' argument that it was error to admit non-MBNA time guides offered by defendant but then exclude plaintiffs' exhibit that contained similar information. This argument fails because the non-MBNA time guides were admitted only to show that other time guides were used in the industry, not for the information contained in them. As discussed earlier in this opinion, the time guides were adequately authenticated and relevant for this limited purpose. Finally, even if plaintiffs had demonstrated the relevance of Exhibit P–50, the document was still hearsay not clearly admissible under one of the hearsay exceptions.

■ Exhibit S–5 is a chart prepared by plaintiffs as a graphic depiction of the deposition testimony of Mr. Wolf-Dietrich Willam. At trial, the court permitted plaintiffs to use the chart to aid the jury in following the Willam testimony as it was read into evidence. Tr. Vol. III (A.M.) at 55. The court later ruled that plaintiffs could use the chart in their closing arguments but that it would not be included in evidence to go to the jury. Tr. Vol. XXI (P.M.) at 193. During their deliberations,

the jury asked to see both a transcript of the Willam testimony and Exhibit S–5. The court permitted the jury to see the transcript but declined to give them Exhibit S–5. The court reasoned that, while the chart was useful to the jurors while they were listening to detailed deposition testimony being read into the record, it was not necessary to their understanding when they had a transcript of the testimony before them. Tr. Vol. XXIX (A.M.) at 64. I hold that this ruling was appropriate and reject plaintiffs' contentions that the court erred in excluding Exhibit S–5 from evidence.

### E. *Other Grounds for Relief*

■ Plaintiffs have moved both for judgment n.o.v. and for a new trial on the ground that the verdict is against the weight of the evidence. To grant a motion for judgment n.o.v., the court must find, as a matter of law, that the prevailing party failed to adduce sufficient facts to justify the verdict and that a verdict in moving parties' favor should have been directed at the end of trial. *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3d Cir.1970), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Where the moving party also has the burden of persuasion, the standard for granting judgment n.o.v. is even more stringent:

> [T]he judge [must] … test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding.

*Gatenby v. Altoona Aviation Corporation*, 407 F.2d 443, 446 (3d Cir.1968) (quoting *Mihalchak v. American Dredging Co.*, 266 F.2d 875, 877 [3d Cir.1959]).

■ Plaintiffs simply do not meet this standard. At the close of defendant's case, a factual issue clearly remained as to whether defendant and its dealers had a "conscious commitment to a common scheme" to fix and raise labor charges for nonwarranty repair work. Based on the evidence presented, the jury could reasonably have concluded that no price-fixing conspiracy existed. Accordingly, plaintiffs are not entitled to judgment n.o.v.

■ I turn next to plaintiffs' claim that a new trial is warranted because the verdict is against the weight of the evidence. A motion for a new trial is within the sound discretion of the trial judge and should be granted only when the verdict is palpably contrary to the clear weight of the evidence or when a miscarriage of justice has occurred. *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 88–89 (3d Cir.1960), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960); *Philadelphia Electric Company v. Hercules, Inc.*, 587 F.Supp. 144 (E.D.Pa. 1984); 6A J. Moore, J. Lucas & G. Grother, *Moore's Federal Practice* ¶ 59.08 (2d ed. 1984). As explained above, there was sufficient evidence in this case from which a jury could conclude that defendant had not conspired with its dealers to fix and raise prices of nonwarranty repairs. A review of the record reveals no other basis for a new trial. Accordingly, I will deny plaintiffs' motion.

■ Plaintiffs also challenge my refusal to permit named plaintiff Jules Link to testify about statements allegedly made to him by Mr. Willi Ascher, an employee of a Mercedes-Benz dealer. At trial, I ruled that plaintiffs had not introduced sufficient evidence of a conspiracy to allow these statements to be introduced against MBNA as coconspirator statements. Tr. Vol. XVIII (P.M.) at 330. Upon further reflection, I observe that the statements were inadmissible also because they were not made to someone involved in the conspiracy and therefore were not in furtherance of it. *See United States v. Gibbs*, 739 F.2d 838, 845 (3d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985).

Plaintiffs have set forth numerous other grounds for relief. *See* Memorandum in Support of Motion by Plaintiffs for Judg-

**694**

ment N.O.V. or for a New Trial at 31–34; Plaintiffs' Reply brief in Support of Motion for Judgment N.O.V. or for a New Trial at 64–71; Supplement to Plaintiffs' Motion for New Trial or Judgment N.O.V.[9] I have carefully considered these arguments and find them to be without merit.

### III. *Motion to Alter, Amend, and Vacate the Judgment*

Plaintiffs contend that, while the judgment entered on October 11, 1984, appears to contemplate a final resolution of this action, there are at least two claims for relief still pending. Specifically, plaintiffs argue that their claims for injunctive relief concerning the pricing of both labor and parts were not concluded by the jury verdict.

■ Plaintiffs' claims for injunctive relief are based on section 16 of the Clayton Act, 15 U.S.C. § 26 (1983), which states:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity....

To make out a violation of section 16, plaintiffs must demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur. *Zenith Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1968).

■ In this case, the jury concluded that MBNA and its dealers had not conspired to fix and raise the price of labor charges for nonwarranty repair work. As a result of this verdict, plaintiffs' claim for injunctive relief relating to labor charges is foreclosed, because plaintiff cannot show the requisite threat of injury from an antitrust violation.[10]

■ Plaintiffs may, however, pursue their claim for injunctive relief relating to parts pricing. In making this determination, I reject defendant's argument that plaintiffs lack standing to bring such an action. I previously ruled that plaintiffs are barred from bringing a treble damages action under section 4 of the Clayton Act by the holding of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), which categorically eliminated indirect purchasers as plaintiffs in such actions. *See supra* note 2. It is well established, however, that section 16 imposes a less restrictive standing require-

**9.** Specifically, plaintiffs contend that the court erred by: (1) separating the trial of labor and parts issues, granting summary judgment on parts damages claims, and excluding from trial evidence concerning parts; (2) deferring a decision on plaintiffs' motions for sanctions; (3) requiring the jury to find conspiracy on a "dealer by dealer" basis; (4) unreasonably constricting plaintiffs' rebuttal case; (5) excluding evidence of MBNA dealers' profitability and refusing to permit cross-examination of dealer witnesses on this subject; (6) excluding evidence of concerted action between MBNA and its dealers in April and May, 1985; (7) refusing to permit plaintiffs to cross-examine dealer witnesses on their knowledge of Hollywood Service Management controls; (8) refusing to require the production of documents from zone offices and failing to investigate allegations of document destruction at zone offices; (9) commenting that certain of plaintiffs' evidence was not germane; (10) permitting defense witnesses to

testify to hearsay matters; (11) refusing to admit evidence of the profitability of MBNA franchises; (12) admitting Exhibit D–268, a summary prepared by MBNA during the course of litigation; (13) unfairly restricting plaintiffs' use of expert testimony; (14) excluding Exhibit P–203 relating to the use of Service Management Controls.

**10.** Plaintiffs incorrectly state that the only issue submitted to the jury was whether the time guide was inflated. In fact, the issue submitted to the jury was whether MBNA and its dealers conspired to fix and raise the price of labor charges for nonwarranty repairs. The jury determined that no such violation occurred. Plaintiffs' assertion that the jury considered only the inflation issue is apparently based on information gained from post-verdict juror interviews. Such testimony may not be used to call into question the clear language of the verdict in an effort to restrict its effect.

ment on a plaintiff than does section 4. *Weiss v. York Hospital*, 745 F.2d 786, 806 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). Thus, under section 16, an indirect purchaser has standing to sue if he can show a threatened loss proximately caused by an antitrust violation. *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir.1979). In this case, plaintiffs allege that they are required to pay higher than competitive prices for Mercedes-Benz parts as a result of a conspiracy between MBNA and its dealers to fix retail parts prices. In other words, they claim that "money is passing from their hands into the pockets of the price-fixers as a result of the conspiracy." *Id.* at 593. Under these circumstances plaintiffs have standing to sue for injunctive relief relating to parts pricing.[11]

I also reject defendant's contention that plaintiffs' claims for injunctive relief have been rendered moot by the consent decree and final judgment entered in a prior action involving MBNA, *Technical Learning Collective v. Daimler-Benz AG*, No. 77–1443 (D.Md. April 9, 1981). Plaintiffs in that action were a class of independent garages that, while in the business of repairing or servicing Mercedes-Benz automobiles, purchased parts from Mercedes-Benz dealers. They claimed that Daimler-Benz Aktiengesellschaft and MBNA conspired with their dealers to eliminate competition in the sale and distribution of Mercedes-Benz parts and to monopolize the sale of such parts by fixing the prices at which the dealers sold parts to independent garages. Under the April 9, 1981, consent decree, defendants

were required to take certain actions designed to open competition in the sale of parts to independent garages. *Technical Learning Collective, Inc., v. Daimler-Benz Aktiengesellschaft*, 1981–1 Trade Cases (CCH) ¶ 64,146 at 76,867 (D.Md. 1981).

Defendant contends that two provisions of the *Technical Learning* decree, Sections VIII.A. and B., obviate the need for the relief sought by the plaintiffs in this action. Section VIII.A. requires MBNA to print clearly and conspicuously on every parts price list thereafter furnished to its dealers the following language:

> The suggested parts prices contained herein are for convenience only; dealers may sell or offer to sell such parts at whatever price, margin, profit, discount or markup they choose.

Section VIII.B. provides, in part, that Mercedes-Benz dealers are not required to purchase parts solely from MBNA. Defendant argues that this is the same relief plaintiffs seek from this court and that no further adjudication of these issues is necessary.

In assessing defendant's contentions, I note first that plaintiffs are not barred from seeking injunctive relief by principles of *res judicata*. While a consent decree possesses the same *res judicata*[12] effect as a judgment entered after a trial on the merits, *Interdynamics, Inc., v. Firma Wolf,* 653 F.2d 93, 96–97 (3d Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981), such a decree bars only parties and their privies from subsequently relitigating the issues settled by

**11.** Even if plaintiffs are unable to prove that concerted activity has resulted in legally cognizable damages, they may still be entitled to injunctive relief. *McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). In the injunction context, once a determination has been made that the defendant has violated the antitrust laws, a plaintiff need only demonstrate a "threatened loss or damage" growing out of a violation. Thus, injunctive relief may be available though plaintiff has not yet suffered or proved actual injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89

S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969). The purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was also to serve the purpose of enforcing the antitrust laws. *Id.* Section 16 should be construed and applied with this purpose in mind. *Id.*

**12.** The doctrine of collateral estoppel is not implicated here since no issues were actually litigated. *See Lawlor v. National Screen Service Corp.,* 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955).

the decree. *American Equipment Corporation v. Wikomi Manufacturing Co.*, 630 F.2d 544, 546 (7th Cir.1980). *See also Madison Square Garden Boxing, Inc. v. Shavers*, 562 F.2d 141, 143 (2d Cir.1977); *Utility Contractors Association of New Jersey, Inc., v. Toops*, 507 F.2d 83, 85 (3d Cir.1974). Because plaintiffs here were not parties to the previous action, they are neither bound by nor able to enforce the consent decree, *Utility Contractors*, 507 F.2d at 85, and are not barred from seeking further injunctive relief on this basis.

 Second, I disagree with defendant's argument that the terms of the consent decree make further injunctive relief unnecessary. In determining whether injunctive relief under section 16 is appropriate, a district court may consider whether previous consent decrees provide a plaintiff with sufficient, enforceable relief. *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1210 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983). As explained above, plaintiffs in the *Technical Learning* action were primarily concerned with wholesale prices of parts sold by Mercedes-Benz dealers to independent garages. In contrast, plaintiffs in this action are retail purchasers of parts who are alleging a conspiracy between MBNA and its dealers to set retail prices. The *Technical Learning* decree was not intended to address the issues raised by plaintiffs here, and its terms do not provide adequate protection for those interests. Consequently, plaintiffs will be permitted to pursue their claims for injunctive relief in the present proceeding.[13]

## IV. *Conclusion*

For the reasons set forth above, plaintiffs' motion for a new trial or judgment n.o.v. will be denied. Plaintiffs' motion to alter, amend and vacate the judgment will be granted to the extent that plaintiffs may pursue their claim for injunctive relief relating to the pricing of Mercedes-Benz automobile parts. Plaintiffs' motions for sanctions will be dismissed. An appropriate order will issue.

---

**13.** I also reject defendant's contention that plaintiffs have waived their claim for injunctive relief relating to parts. In the April 30, 1984, order, the court set for trial only issues relating to the pricing of labor charges for nonwarranty repairs. That order also instructed the parties that plaintiffs could continue to seek parts injunctive relief. No time frame was suggested for seeking such relief. While the court was under the impression, perhaps mistaken, that plaintiffs were not going to pursue their claim for injunctive relief, now that they have indicated their interest in doing so, the opportunity will be open to them.